LEAR, Judge.
Clarion Bay, Jr., an inmate at the Louisiana State Penitentiary at Angola, sued defendants Ross Maggio, Warden, Louisiana State Penitentiary (LSP), the State of Louisiana, through the Department of Corrections, C. Paul Phelps, Director of the Department of Corrections, and fourteen individual employees of LSP. This suit was tried on the merits before a commissioner of the Nineteenth Judicial District Court, whose findings of fact and recommendations were adopted by the district court. Judgment was then rendered by the district court in favor of defendants and against plaintiff, dismissing plaintiff’s suit. From that dismissal, plaintiff has appealed.
The factual basis for this suit, the commissioner’s findings of fact and his conclusions of law, are set out in a well written report to the district court, which we adopt, in part, as follows:
“This is a suit for damages arising from alleged personal injuries received by the plaintiff, an inmate at Louisiana State Penitentiary at Angola. Three secondary issues are involved: damages due the plaintiff if his injuries amount to a violation of the plaintiff’s right to be free from cruel and unusual punishment; damages arising from improper medical attention received by the plaintiff subsequent to his injuries; and attorney fees due plaintiff in a claim arising under 42 U.S.C. 1983, 1988.
“This case centers on a reconstruction of events that took place on April 20, 1976, at the Louisiana State Penitentiary at Angola, Cellblock B. Certain facts are held in common by the plaintiff and the defendants and can be reviewed first.
“During a shakedown of the plaintiff’s cell, a dispute arose over some sheets being kept by the plaintiff, Mr. Bay. When it became apparent that the shakedown crew was going to take and not return the sheets, the plaintiff tore a 2 X 4 board from a window screen frame and began to menace the security officers, demanding the return of the property.
“Over the course of an hour or more, the plaintiff moved about the tier of the cell-block, all the while armed with his makeshift club. After several unsuccessful attempts to persuade the plaintiff to put the 2X4 down and return to his cell were made by different members of the prison staff, tear gas was used. This effort, too, was fruitless, as a breeze carried the gas back upon the officers who fired the cannis-ters.
“Finally, guards were sent out onto the tier to physically subdue the plaintiff. This was accomplished after a brief, but very violent, struggle. The plaintiff then was removed from the tier, searched, and ordered to change his clothes. He was taken from the cellblock to the prison hospital, where he was given medical attention for injuries received to his hands. Plaintiff was placed in isolation for fifteen days and then moved to Closed Cell Restriction (C.C. R.).
“The first problem facing this Court lies in deciding when and how the plaintiff’s hands and wrists were fractured in several places. According to the plaintiff, after he was subdued, searched, and in new clothing, he was brought to the lower tier lobby. There, while being held by defendants By-rageon, Mayeaux, and Rabalais, defendant Robert Brumfield hit the plaintiff’s hands, which were laid out on a step, with a baseball bat.
*1388 “The testimony of the plaintiff was denied by the four above-named defendants, who all said they neither hit the plaintiff nor heard any order that such a beating was to take place. Also present in the downstairs lobby were Claude Bordelon, Bert Dixon, and Bruce Beck. These defendants also testified that the plaintiff was brought down from the upper tier, through the downstairs lobby, and out of the cellblock without incident.
“The Court is aware that it is not unusual for fellow defendants, after a lapse of time, to agree upon a single set of facts. The defendants in this case testified that they did not know for certain how the plaintiff was injured. They assumed the fractures were received in the confrontation on the tier. If these assumptions and denials were unsupported by the remainder of the evidence, I might have found the plaintiff’s version to be more reasonable.
“The Court, however, finds that the weight of the evidence shifted with the testimony of three other defendant witnesses. Both Michael Beaubouef and William Kerr testified that they heard the plaintiff complaining of hand injuries while he initially was being removed from the upper tier to the upstairs lobby.
“During the Court’s questioning of Mr. Beaubouef, the defendant was asked:
“ ‘Q. Did you observe Mr. Bay at the time of being removed into the upper lobby?
“ ‘A. Yes, I did.
“ ‘Q. Can you describe what his condition was at that time?
“ ‘A. He was being removed from the tier; both arms were secured. He was being pulled, partially dragged, partially walking. He got outside. He said “my hand hurts.” I remember that. I said, “well, you’re going to the hospital.” That’s all I remember. He didn’t say anything else that I recall then. He was taken out.’ (Tr. p. 192).
“Even more enlightening was the testimony of Mr. Kerr, who at the time of the incident was an associate warden for treatment at the institution. Counsel for the plaintiff asked Mr. Kerr about the period immediately after Mr. Bay was subdued.
“ ‘Q. Do you remember telling Mr. Sam-aha that Clarion Bay appeared to be injured?
“ ‘A. I may have made that statement. If you are asking me if he appeared to be injured, I would say “yes, he appeared to be injured.”
“ ‘Q. Okay. How did he appear to be injured?
“ ‘A. How did he appear to be injured? It appears to me that his hands were hurt when he came off of the tier because he was complaining.
“ ‘Q. What did you see that led you to that?
“ ‘A. I said he was complaining about his hands.
“ ‘Q. What did he say?
“ ‘A. Well, my hands hurt.
“ ‘Q. Did he say that when he came off the tier?
“ ‘A. Well, before he came off the tier when they were picking him up. See, I was near him when they picked him up. I came out ahead of them, walked to that tier.’ (Tr., p. 220).
“The most impressive testimony of all was that of Ross Maggio, who was Warden of Louisiana State Penitentiary at the time, and who has since left there to become Warden of Hunt Correctional Institute.
“On direct examination, this exchange took place between Mr. Maggio and counsel for the defense:
“ ‘Q. Did you see how Mr. Bay was subdued?
“ ‘A. You know, as best I could. With 7 or 8 men there, it was very, very fast. He slung; he swung his 2 by 4 and [sic] officer blocked it with a bat. Maybe the man behind struck Clarion with a blow and then maybe I could see 3; you know, a few blows being struck. I immediately told them to back off which they did.
“ ‘Q. At that time, was Mr. Bay down on the — on the tier floor?
“ ‘A. When I got there, he was — he was down.
*1389 “‘Q. What did you do once — once, was down? he
“ ‘A. I instructed them to bring him out to the lobby when he—
“ ‘Q. You just testified that when you got there, he was down on the floor. What do you mean — got there from where?
“ ‘A. Well, I was just — I wasn’t any further than from the 2 of us, the distance from here to you, short, right behind the whole thing.
“ ‘Q. How many correctional officers would you say were between yourself and Mr. Bay?
“ ‘A. Five, six, seven — I don’t really recall.
“ ‘Q. Okay. You testified that you told them to remove him off of the tier after he was on the floor. How was he removed?
“ ‘A. He was drug out — a man had him under each arm, best I recall.
“ ‘Q. And where was he taken?
“ ‘A. He' was taken out to the lobby.
“ ‘Q. Did you follow them?
“ ‘A. I did. I was with them during all of this.
“ ‘Q. Which lobby was this?
“ ‘A. This was the second floor.
“ ‘Q. What occurred once Mr. Bay was in the lobby?
“ ‘A. Well, I remember he told me that they had hurt his hands or hurt his arms is what he told me.
“‘Q. What did he look like? Did he seem to be injured?
“ ‘A. He did. Each — as I recall, his two hands were sort of hanging like this. I instructed my people to get him over to the hospital.
‘“(THE COURT: Let’s let the record show that the description made by Mr. Maggio, the way the hands were hanging were limp writs [sic] were down with the elbows up. Is that right?
“ ‘A. Yes, sir.
“ ‘By Mr. Macaluso:
“ ‘Q. You say he stated something to you at that time?
A. He told me that his — I don’t recall if he said ‘they hurt, my hands or they hurt my arms.’ One of the two, but he made a statement.’ (Tr., pp. 310-312).
“The Court was very impressed by the candor exhibited by Mr. Maggio throughout his testimony. I am convinced that if events such as plaintiff alleges had indeed occurred,- Warden Maggio would have meted out disciplinary action at the time and would have testified to such actions in Court. As he gave testimony refuting such actions and which, along with the testimony of Mr. Kerr and Mr. Beauboeuf, supported the defense assumption that Mr. Bay was injured while being subdued, I recommend this to be the most reasonable interpretation of the evidence.
“As plaintiff, Mr. Bay must prove his case by a preponderance of the evidence. Mr. Bay has failed to carry the burden of showing that the injuries to his hands were deliberately inflicted by four members of the prison staff. I therefore recommend finding in favor of the defendants and rejecting the plaintiff’s demands. We can now proceed to the subsidiary issues in the case.

“Claim of Cruel and Unusual Punishment

“To begin with, it appears that no excessive force was used in subduing the plaintiff. Attempts were made for over an hour to persuade the plaintiff to return to his cell. When that failed, tear gas was used, and that effort also was unsuccessful. Only then were officers sent out on the tier. In view of the plaintiff’s physical size, which to this Court seemed about six feet four inches to six feet five inches tall and at least 250 pounds, sending in several officers armed with clubs appears to have been reasonable.
“The confrontation was brief, but extremely violent, as can be exhibited by the splintered fungo bat wielded by Officer Bruce Beck, the officer first onto the tier who made initial contact with the plaintiff. The struggle took place on a concrete walkway and the weapons of Mr. Bay and the officers were heard as they struck each *1390 other, the cell bars, and the iron railing. Considering the violence of the encounter and the physical surroundings of the struggle, Mr. Bay’s injuries can be all the more reasonably seen to have been received as the defense has assumed. The force used to subdue the plaintiff was reasonable and well within the limits imposed by the law.
“The First Circuit Court of Appeal affirmed the wide latitude afforded prison authorities in maintaining discipline within prisons. In Fulford v. Phelps, 365 So.2d 575 (La.App., 1st Cir., 1978), the following language of the Trial Court was affirmed:
“ ‘Prison authorities are and should be responsible for maintaining internal order and discipline and securing their institutions against escape. These administrators must have a great deal of discretion in accomplishing their purpose within constitutionally refined parameters.”

“Claim of Improper Medical Treatment

“I find that the plaintiff’s claims that he received improper medical attention following the incident also are not supported by the evidence. The plaintiff’s testimony is contradicted by other testimony and evidence presented at the hearing.
“Mr. Bay testified that after being treated at the prison hospital, he was taken to C.C.R. isolation and kept there for fifteen days without coming out, without being seen by anyone, and without receiving any medical attention. From the evidence presented, it would appear that the plaintiff was mistaken in his testimony.
“The medical records, as substantiated by the testimony of Dr. Thomas Beamon, indicate that Mr. Bay was treated immediately after the incident and was then seen by Dr. Beamon on April 22, April 26, and April 29, 1976. He was also seen by Dr. Kim on April 27 and by Dr. Boo on April 26. In fact, Dr. Beamon testified as to these visits when on direct examination by counsel for the plaintiff. These statements were not contested by the plaintiff, even though they directly contradicted the plaintiff’s own claim.
“Upon release from isolation, Mr. Bay was placed in C.C.R. proper. On May 6, 1976, Dr. Beamon reset the cast and fingers of plaintiff’s right hand in order to allow its better use. Dr. Beamon continued to examine the plaintiff on May 15, 1976, May 27, 1976 and after the casts were removed on June 9, 1976.
“Dr. Beamon’s evaluation of June 10, 1976, says of Mr. Bay: ‘Clinically doing okay. Begin active exercises of each joint. This was explained to the patient at some length; recheck in one month. Patient can now bathe and take care of himself. No field work for one month.’ (Exhibit D-4)
“According to the plaintiff, he received no pain medication. The record shows that Tylenol and Phenaphen 3 were prescribed. The plaintiff claimed that he could not bathe himself and was not given baths. The medical record showed, and Dr. Beam-on testified, that baths were ordered, and witness Herman Wallace, occupant of a nearby cell in C.C.R., testified that the plaintiff was occasionally allowed out of his cell.
“The plaintiff was injured in April, 1976, and was seen by an orthopedist the following September. Mr. Bay claims to have been requesting such an examination since the time of the cellblock incident. The medical record shows that as early as April 29, 1976, an orthopedist was scheduled to see the plaintiff. The entry of that date states that the orthopedist did not show up at the prison facility. Dr. Beamon explained the delay as being due to the summer staffing changes taking place at Earl K. Long Hospital in Baton Rouge and the penitentiary’s lack of control over the comings and goings of such specialists working out of Earl K. Long (Tr., pp. 91-92).
“The plaintiff raised a point of being allergic to codeine, an ingredient in Phena-phen 3, a medication taken by the plaintiff. This condition is noted in the medical file. At the time involved in this case, however, this allergy appears not to have been known. In the report of Mr. Bay’s annual examination of October 26,1976, a notation states that Mr. Bay had no known allergies. *1391 This would make a prescription of Phena-phen 3 reasonable. No evidence was presented to show that the plaintiff was unable to take the prescribed pain medication.
“The plaintiff’s contention that he was not given proper medical attention is unfounded. The medical record and the testimony show that plaintiff was being examined, cared for, and having his progress monitored for the entire period of his recovery. The medical care afforded the plaintiff was well within the standard of care required by law. These medical services need only be reasonable to satisfy the standard. (Brown v. State, 392 So.2d 113, La. App., 1st Cir., 1980)
“In view of my finding that the plaintiff’s injuries did not arise as claimed by Mr. Bay, and that he was properly cared for after the incident of April 20, 1976, I find that the plaintiff suffered no violation of his guaranteed right to be free from cruel and unusual punishment.

“Claim for Attorney Fees

“In 42 U.S.C. 1988, attorney fees are required only to be awarded to the prevailing party in a 42 U.S.C. 1983 action. As the plaintiff in this case has been unsuccessful in proving his claim, he has no right to any attorney fees.”
After carefully reviewing this entire record, including the extensive testimony and exhibits, we find that the commissioner’s findings of fact, as adopted by the district court, are reasonable and clearly supported by the evidence. In the absence of manifest error the judgment of the trial court will not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979); Canter v. Koehring Company, 283 So.2d 716 (La.1973).
For the foregoing reasons, the judgment of the trial court, dismissing plaintiff’s suit, is hereby affirmed. This appeal having been filed in forma pauperis, no costs are assessed against plaintiff-appellant.
AFFIRMED.